IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 5, 2005 Session

## RAYMOND P. WHITE, ET AL. v. HICKMAN COUNTY, TENNESSEE

**Appeal from the Chancery Court for Hickman County**
**No. 0015226     Timothy L. Easter, Judge**

---

**No. M2004-00232-COA-R3-CV - Filed May 10, 2005**

---

In these consolidated cases, certain property owners in Hickman County, Tennessee, challenged the way Hickman County imposed and administered solid waste disposal fees, asserting the improper use of disposal fees to retire debt incurred in closing a previous landfill and further asserting collection of fees beyond what was necessary for the operation of the solid waste department.  Judge R.E. Lee Davies granted a partial summary judgment to the County, and following trial on the merits on the remaining issue, Judge Timothy Easter rendered judgment for Defendant, Hickman County.  We affirm the actions of both of the trial judges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Phillip L. Davidson, Nashville, Tennessee, for the appellant, Raymond P. White.

Peggy L. Tolson, Catherine Schmidt, Brentwood, Tennessee, for the appellee, Hickman County, Tennessee.

### OPINION

Plaintiffs are residents of Hickman County, Tennessee, and brought this suit seeking relief from payment of disposal fees imposed by the County for solid waste disposal.

By chapter 451 of the Public Acts of 1991, Tennessee adopted the Solid Waste Management Act.  This Act was codified as Tennessee Code Annotated Title 68, parts 8 and 9.  Pursuant to Tennessee Code Annotated section 68-9-211, the county legislative body of Hickman County, on April 18, 1994, declared Hickman County to be a solid waste region and undertook by committee to establish a 10-year Municipal Solid Waste Management Plan.  Following the development of such plan, the Hickman County legislative body, on September 19, 1994, adopted Resolution No. 9456 implementing the 10-year Municipal Solid Waste Management Plan.  On October 16, 1995, the

Hickman County legislative body adopted Resolution No. 9570, which, pursuant to Tennessee Code Annotated section 68-211-835, imposed a fee schedule for solid waste disposal services. This Resolution provided in pertinent part:

**SECTION 1:** Pursuant to § 68-211-835, <u>Tennessee Code Annotated,</u> the following fee schedule for Municipal Solid Waste Disposal in Hickman County is hereby adopted:

RESIDENTIAL – $ 90.00 per dwelling unit per year
BUSINESS – $180.00 per business unit per year
INDUSTRIAL – $ 10.00 per ton over disposal cost

**SECTION 2:** RESIDENTIAL and BUSINESS MSW FEES shall be billed semi-annually to the owner of the residential or business unit. Residential and Business billing, including home-based businesses, shall be determined by how the property is listed in the Hickman County Assessor's Office. Owners of multi-unit residential property shall be billed for each unit. The Hickman County Finance office shall be responsible for billing and collecting such fees.

. . . .

**SECTION 7:** Elderly and disabled property owners qualifying for property tax reductions, according to records in the Hickman County Trustee's Office, shall also qualify for a like deduction in MSW Fees.

. . . .

**SECTION 9:** The fees generated by this resolution shall be deposited into the Hickman County Solid Waste Management Fund and shall be used only for the purpose for which they were collected. The amount of fees charged may be adjusted as required, but shall at all times bear a reasonable relationship to the cost of providing solid waste disposal. All residents of the county shall have equat (sic) access to the services provided.

On May 19, 1997, the Hickman County legislative body further amended Resolution No. 9570 by the adoption of Resolution No. 9724 providing in pertinent part:

**SECTION 1**: The following terms which are used throughout the Hickman County Solid Waste program are hereby defined as follows:

RESIDENTIAL -- Any dwelling unit constructed for human habitation, either in use or intended for use during the current billing cycle.

NON-PERMANENT -- Any dwelling unit used only for recreation purposes or as a part-time residence (hunting cabins, etc.)

COMMERCIAL – Any for-profit, non-profit or not-for-profit business and/or organization that buys and/or sells as retail or wholesale, or is service related, including assembly and or construction. Commercial customers shall be classified into one of five waste generators.

INDUSTRIAL -- Any business whose main purpose is manufacturing or the production of a specific product or products, and any entity whose waste volume fluctuates and is deemed to be out of compliance with current Commercial Classifications. Waste shall be delivered directly to the Hickman County Solid Waste Transfer Station where it will be weighed and billed through a pre-approved charge account.

**SECTION 2:** Sections 1, 2, and 3 of Resolution No. 9570, with respect to Business or Commercial accounts and the fee charged to them is hereby changed to the following five classifications and fees:

Class A – In-Home Business (residential fee exempt)     $125.00 annually

Class B – Extra Small (up to 2 cu.yds per week     $ 90.00 annually

Class C – Small (above 2 and up to 5 cu.yds. per week)     $150.00 annually

Class D – Medium (above 5 and up to 10 cu.yds.per week     $300.00 annually

Class E – Large (above 10 cu.yds. per week)     $600.00 annually

The above fees will be billed annually on the first day of July of each year and shall be due and payable by September 30 of each year. This change shall become effective upon July 1, 1997, and customers shall be credited for any payment made prior to this change with respect to the current billing cycle.

**SECTION 3:** Section 7 of Resolution No. 9570 is hereby further amended to include a fifty percent (50%) exemption for low income households based upon

the most current poverty guideline index as prepared by the Federal government. Persons desiring to take advantage of this exemption shall furnish a copy of the household most recent IRS 1040 statement. Additionally, there is hereby authorized a fifty percent (50%) exemption for hunting cabins and second homes (cabins and homes which are used only for part-time recreational purposes). The aforementioned exemptions shall be in effect retroactively to residential billing for the first half of the calendar year 1997. Also, retroactively effective to July 1, 1996, all churches are hereby exempt from solid waste fees unless they have a daily operation or program (day school, etc.). In such cases, they shall be billed according to the current Commercial billing system.

Contemporaneously with Resolution No. 9570, the county legislative body, in October of 1995, approved Resolution Nos. 9571 and 9572 authorizing capital outlay notes in the respective amounts of $900,000 and $700,000. The $900,000 note was issued for the purpose of financing the cost of final closure of the existing landfill and to establish a reserve for post-closure care of that facility. The $700,000 note was issued for the purpose of constructing a transfer station and two (2) convenience centers, together with building roads, grading and purchasing equipment for the solid waste disposal department. Both of these notes contained language mandated by Tennessee Code Annotated section 9-21-603, same being:

> That, the Notes shall be direct general obligations of Hickman County and Hickman County hereby pledges its taxing power as to all taxable property in Hickman County for the purpose of providing funds for the payment of principal and interest on the Notes. The Legislative Body of Hickman County hereby authorizes the levy and collection of a special tax on all taxable property of Hickman County to create a sinking fund to retire the Notes with interest as they mature in an amount necessary for that purpose.

There were seven original plaintiffs, five of whom were owners of business property in Hickman County and two of whom were owners of residential property in Hickman County. The lawsuit, in a nutshell, is stated in the Complaint:

> 3.1. That the fee set forth in the Resolution collects more funds than are required to meet services.

> 3.2. That the fee is not being levied in a uniform, non-discriminatory manner. Some owners of property described in the Resolution are not charged. Some residents are being charged, but receive no services. Others are not charged equally such as elderly and disabled persons, business on property where the taxpayers homes are also located are charged unequally in relation to taxpayers who run a small business out of their homes. Some industrial users pay less of a fee than business and residential property owners.

3.3. The fee is not equally levied in that some property owners are granted exemptions by an arbitrary method known only to County officials.

3.4. The disposal fee heretofore set forth and described in paragraph 2.6 (Exhibit A) violates the Tennessee Solid Waste Management Act, Tenn. Code Ann. 68-211-101, et seq., in that it collects funds not solely used for solid waste management purposes and is not uniformly assessed against all Hickman County residents.

WHEREFORE, the plaintiffs, demand the following relief.

1. That this Court grant them a hearing at which time the issues raised in this complaint may be fully adjudicated.

2. That this court Declare the Resolution (Exhibit A) to be in violation of Tennessee Code Ann. §§ 68-24-101, et seq., or in the alternate, that the County has exceeded its legal authority by its continued implementation of the Resolution.

3. That the Court order that the County reimburse all county citizens who have paid fees set forth by the Resolution they have paid to the County.

4. That the Court grant such other and further relief as it deems proper.

After a considerable amount of discovery, the case was heard on November 20, 2002, before the Honorable R.E. Lee Davies, circuit judge, on Defendant's Motion for Summary Judgment. This hearing resulted in an Order of December 17, 2002, providing in pertinent part:

This case presents three issues for determination by the Court.

1. Whether the fees charged by Defendants for the providing of solid waste disposal services bears a reasonable relationship to the costs of providing said services;
2. Whether the fees collected by Defendant's solid waste disposal fund are properly segregated and only used for solid waste purposes; and
3. Whether the exemption process utilized by the County for the payment of solid waste disposal services is uniformly applied under the equal protection clause.

With regard to the first issue, the Court finds that summary judgment is proper. T.C.A. § 68-211-835(g)(1) requires that the fees charged bear a reasonable relationship to the cost of providing solid waste services. This does not require that the amount charged be identified with mathematical certainty. The undisputed testimony of the State Auditor who is responsible for auditing the Fund reveals that the Fund is losing money. Thus, no unreasonable relationship between fees and

-5-

services exists as the Fund is not making a profit. The Auditor further testified that this Fund is required to be maintained as a Enterprise Fund and the accrual method of accounting is the proper method for evaluating the profitability of the this (sic) fund. Plaintiffs have offered no expert proof to contradict these facts, therefore, summary judgment on this issue is GRANTED.

The statute requires fees to be segregated from the general fund and used only for the purpose collected. The funds generated are to be used to establish and maintain solid waste collection and disposal services. With regard to this second issue, as a matter of law, this Court finds that the capital outlay notes in the amount of $700,000.00 and $900,000.00 are start up costs for the Fund and are properly payable from this Fund. However, disputed issues of fact remain regarding whether funds transferred from this Solid Waste Fund to the County's General Fund are properly being used to retire these notes. Moreover, there remains questions with regard to the authority of the County to make repayment of the notes from the Solid Waste Disposal Fund based upon the language of Resolution Nos. 9571 and 9572 authorizing the County to incur the notes. Summary judgment is therefore DENIED with regard to these issues at this time.

Finally, the Court finds that Plaintiffs have no standing to complain about how property owners other than themselves may have been mistreated in relationship to the exemption process established by the County for payment of solid waste disposal fees. However, the Plaintiffs may be able to show that others are being treated more favorably than Plaintiffs and, if so, they will have met their *prima facie* burden of proof. The Court finds that, with the passage of Resolution No. 9724 amending the original Resolution No. 9570, the current Resolution, as written, containing exemptions is not arbitrary and has a rational basis in fact and has corrected any prior inequities. Defendant's Motion for Summary Judgment with regard to this third issued is, therefore, DENIED at this time, but Plaintiffs' proof is limited to post-amendment examples of unequal treatment, if any.

The first question to be resolved is whether or not the grant of summary judgment by Judge Davies is correct in holding that the fees charged by Defendant for the providing of solid waste disposal services bears a reasonable relationship to the cost of providing said services. The answer to this question depends on whether or not we are concerned with a cash basis accounting method as opposed to an accrual accounting method. The Supreme Court has held:

The Solid Waste Management Act expressly regulates the imposition, collection, and use of fees and surcharges by the state and local governments; it limits the use of proceeds collected by local governments; and it requires that the comprehensive plan for the management of solid waste include a uniform accounting system developed by the State comptroller.

*City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 413-14 (Tenn.1997).

Tennessee Code Annotated section 68-211-874 (2000) provides:

**68-211-874. Accounting for financial activities — Funds — Uniform solid waste financial accounting system — Development — Approval — Requirement for state funds. —** (a) Each county, solid waste authority and municipality shall account for financial activities related to the management of solid waste in either a special revenue fund or an enterprise fund established expressly for that purpose. Any county, solid waste authority or municipality that operates a landfill and/or incinerator shall account for financial activities related specifically to that landfill and/or incinerator in an enterprise fund. Each county, solid waste authority and municipality shall use a uniform solid waste financial accounting system and chart of accounts developed by the comptroller of the treasury.

(b) The comptroller of the treasury is directed to develop a uniform financial accounting system conforming to generally accepted accounting principles for use as required by this section.

(c) Such uniform accounting system shall be subject to the approval of the commissioner of finance and administration. Upon such approval, each county shall establish and maintain the uniform solid waste financial accounting system.

(d) No state funds for solid waste management shall be released to a county, solid waste authority or municipality unless financial activities related to the management of solid waste are accounted for in either a special revenue fund or an enterprise fund established solely for that purpose. No state funds for solid waste management shall be released to a county, solid waste authority or municipality that operates a landfill and/or incinerator unless financial activities related to that landfill and/or incinerator are accounted for in an enterprise fund.

The documentary evidence before the Court, using a cash flow analysis, creates at least a material question of fact as to whether or not the fees generated are excessive. The undisputed expert proof, however, establishes that the solid waste management fund in Hickman County is an "enterprise fund" as defined in section 68-211-874 of the Code and as developed by the comptroller of the treasury pursuant to that same statute.

The expert testimony offered by Jerry Durham, state auditor employed by the comptroller of the treasury, established that the County was required by state law to begin operating the solid waste disposal system under "an enterprise fund," which requires an accrual basis of accounting rather than a cash basis. At the start of the operation, the County contributed to the enterprise fund all equipment, land and buildings, together with related property, which contributions form intergovernmental contributed capital. Long-term obligations must be provided for under the accrual method and taken into consideration in determining the financial performance of the enterprise fund. Mr. Durham testified:

Q Overall, did you find that the fund was, from inception, was making money or losing money?

A It was typically losing money.

Q And that's what accounts for even as of the last completed audit period, a nearly three-quarter of a million dollar retained earnings?

A That and, of course, the fact that everything is recorded on the accrual basis of accounting, which requires your post closure care cost to be recorded now even though you're going to be paying for them over 30 years. And that requires the booking of that $900,000 note, even though you're going to be paying for that over whatever the life of the loan would be. So, when you look at your assets compared to your liabilities, and because you've booked these two large liabilities, it makes your deficit look worse than you might consider it to be. But it is a true deficit based upon generally accepted accounting principles.

The familiar standard of appellate review relative to a grant of summary judgment requires that the record before this Court affirmatively disclose that there is no genuine issue of material fact warranting trial. The moving party has the burden of showing the court that there are no disputed material facts and that the moving party is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993). This expert testimony being undisputed, the results of a cash basis accounting would be immaterial, and summary judgment was properly granted.

Appellants next complain of the method used by the County for the payback of the two capital outlay notes by which money was procured to close the existing Hickman County Landfill and to construct new landfill facilities.

At the outset, these two capital outlay notes were approved by the Hickman County legislative body and forwarded to the comptroller of the treasury on October 18, 1995. The letter from Hickman County Executive Steve Gregory to the director of local finance of the office of the comptroller provided:

Enclosed you will find two Capital Outlay Notes recently approved by the Hickman County Legislative Body. Both have to do with solid waste, but were separated because they will be utilized at different times and will be paid back by different means.

The first, Resolution No. 9571, is for an amount not to exceed $900,000. This is for closure of current cells at the Hickman County Landfill, and we do not plan to execute this note until next spring. The note will be retired through the General Debt Service.

-8-

The second, Resolution No. 9572, is for and (sic) amount not to exceed $700,000 and will be executed as soon as possible. The note is for construction of landfill facilities and will be retired through user fees generated by the Hickman County Solid Waste Department.

Regardless of the source of funds contemplated by the County legislative body to be used for the payback of these two capital outlay notes, state law found in section 9-21-603 of the Code requires that both notes be general obligations of Hickman County and that Hickman County "pledges its taxing power as to all taxable property in Hickman County for the purpose of providing funds for the payment of principal and interest on the notes."

The problem lies with the insistence of Plaintiffs that the method contemplated for repayment of the notes by the County legislative body had to, in fact, be put into place and followed in the future. The trial court held:

21. Initially, the $900,000 note was to be retired through the County's General Debt Service Fund, and the $700,000 note was to be retired from income generated by the Solid Waste Disposal Fund.

22. After the recommendation of the state auditor, the County began paying the $900,000 note from the Solid Waste Disposal Fund and the $700,000 note from the General Debt Service Fund.

How the County chose to pay back the money has no bearing on the fact that both of the notes, by their terms and by statutory mandate, constituted general obligations of the County. Since the proceeds of both notes were contributed by the County to the enterprise fund, as clearly reflected in the Enterprise Fund Audit Report of June 30, 1996, the future payback of these notes plus interest had to be attributed to the enterprise fund under the accrual method of accounting. This is the undisputed testimony of State Auditor Jerry Durham. He testified, while reviewing the June 30, 1997, audit of the enterprise fund:

Q          Total expenses 910,515?

A          Right.

Q          Did this 910,515 include post closure care costs?

A          Yes, it did.

Q           Can you explain, and we're going to see this several times in some of these audits, so we might as well go ahead and explain this now. What is, to your understanding, is post closure care cost here?

A            Post closure care costs are a percentage of a figure that is calculated by an engineer of how much it's going to cost to close and then to maintain closure of a land fill for a period of 30 years.  So this number on Page 110 represents a percent of the capacity of the land fill used, multiplied times an estimated number of those costs.

Q            To a layman though, this money, this $239,000, is not actual, real dollars that the county paid out in that year, right?

A            That's right.  It's an estimated number based on an engineer, what he's told us.

Q            Was there also a charge in here for building a transfer plant?  It may not be in this year.  I'm just asking.

A            No.  Because of the nature of the enterprise fund, it's operated on an accrual basis, so that would have been booked as an asset.  And any number that we would have used to record the cost of a building would be recorded as an asset and not in the expenditures.

. . . .

Q            Let's see if I can go over to the – – to any findings, and I think they would be on 128.  Is that the – – basically the only finding that you made here in this year?

A            Yes.

Q            Now, let's talk about this finding if I could.  Did you find that the problems that you had noted in the year before, in terms of – – had been corrected?

A            Yes, they were able to provide us with a detailed listing of accounts receivable in this audit year.

Q            Now, explain to me your finding on Section B there on 128?

A            Let me read it just briefly.

Q            Sure.  Take your time.

A            Basically what I'm saying is there was a note.  And that note, which was payable to a bank, had not been recorded on the balance sheet of this fund.  And since it's an enterprise fund operating under a full accrual basis of accounting, it

should have been. They also charged interest to this fund, but they did not charge the correct amount of interest to this fund. And the difference was $18,939. And so we showed that amount as being due to, I believe, the debt service fund.

Q          Now, this was a note to build the land fill is that – – not the land fill, but the transfer?

A          No. This $900,000 note, if I recall correctly, was a note to actually close the land fill, put the cover on it basically, and then to set up a reserve for any post closure care costs that might have been incurred after the land fill was closed. I believe we set up something like $262,000 worth of reserve at this point.

Q          Was this money supposed to be taken out of solid waste disposal fund?

A          That's – – it really didn't have to be at first. The money was paid out of the debt service fund. But then by resolution of the county commission, they decided to put this $900,000 debt into the fund and allow the fund to pay the principle and interest on that debt.

Q          Originally it was not supposed to be done that way?

A          Actually, you can't say it wasn't supposed to be done that way. It would be correct to do it either way. It would have been correct, in terms of accounting, to have placed it in the debt service fund or to have placed it in the enterprise fund. In my judgment is that the most appropriate accounting for this 900,000 is in the land fill fund, because it should operate as an enterprise. It should pay its own debt.

Q          Now, what about the transfer station, was that also to be paid out of solid waste disposal?

A          That money was the $700,000 note, and they chose not to pay that out of the – – out of the land fill fund. That's being paid through the general debt service fund of the county.

Q          So if money had been taken out the (sic) of the solid waste disposal account to pay for that, that would have been improper?

A          No, sir, it wouldn't.

-11-

Q                Well, it would have gone against what the county commission originally determined was going to be the method of payment for that land – – for that transfer station, would it not?

MR. SCHWALB: Object to the form of the question.

THE WITNESS: As I say, they could have done it either way they wanted to. At first, I think it was – – now, this is only my opinion, if you understand. I think they didn't do a lot of thinking about it. They borrowed the money. They built the transfer station. They closed the land fill. And sort of as an afterthought they said, well, why shouldn't the land fill pay for at least one of these notes; I mean if one of these notes has gone to either build the transfer station or operate the land fill. But they chose to put in the enterprise fund the one that did – – that dealt with the closure of the land fill specifically. And I think if you're going to choose one of the two, that would be the most appropriate one, because it strictly dealt with the land fill.

It is clear that under the accrual method of accounting, the payback of the entire $1,600,000 debt, evidenced by the two notes, was correctly chargeable to the enterprise fund, regardless of whether the payback actually occurred from the enterprise fund or from other general funds of the County. Nothing in Tennessee Code Annotated section 68-211-835(g)(1) or in any other statute provides that the enterprise fund be the sole source to be used by the County in repaying these capital outlay notes. The statute only provides that funds generated in the form of solid waste fees may only be used to defray the costs of solid waste disposal services.

Every dime of the $1,600,000 evidenced by the two capital outlay notes was transferred by the County to the enterprise fund in 1996. If one could relieve the enterprise fund of the obligation of repaying these notes with interest, the fees collected would be excessive. However, the payback of the notes and interest is clearly contemplated by the accrual method of accounting to be charged against the enterprise fund, and the result is a continuing deficit in that fund. The fact that portions of the payback are made from the general funds of the County is not a material consideration since both of the notes are general obligations of the County anyway. As held by the trial court, there is no proof that solid waste disposal fees have been used for any purpose other than solid waste disposal and management. Here, the inquiry comes to an end.

The remaining issue posed by Plaintiffs involves their assertion of unequal treatment of themselves in relation to the exemption process relative to solid waste disposal fees and the further assertion that the exemption process is arbitrary and capricious. In this respect, it is well to note that only three of the plaintiffs testified in the case or presented any evidence to support any allegation of unequal treatment.

In its findings of fact, the trial court stated in pertinent part:

2. . . . Elderly and disabled residents who qualified for a reduction in property taxes qualified for a like reduction for payment of the disposal fee.

3. On May 19, 1997 the County passed Resolution No. 9724 to amend Resolution No. 9570 and clarify the classification system and provide for additional exemptions. Resolution No. 9724 established more specific definitions for the previous three classifications and added a fourth classification, Non-Permanent. It also provided a 50% exemption for low-income households, owners of hunting cabins or second homes used for recreational purposes, and churches which have no daily operations or programs. The basic fee and exemption structure set forth in Resolution Nos. 9570 & 9724 remain in effect today. (Trial Exhibit 3)

4. Both Resolutions required payment for residential dwelling units. If the property did not contain a habitable dwelling, no payment was required. If the property contained a habitable dwelling, but the dwelling would not be used during the year, no payment was required. It was the property owner's responsibility to pursue the exemptions with the Solid Waste Department.

5. Resolution No. 9570 authorizes the Solid Waste Committee to handle disputes with regard to matters not specifically addressed in the Resolution, including billing.

6. The testimony is undisputed that the Solid Waste Committee has the power to grant exemptions from payment of the disposal fee.

7. The committee delegated this duty in part to the Director of Solid Waste and the billing clerks in the solid waste office. When the exemption requested clearly fit with an exemption from the Resolutions, this office could grant the exemption. If the solid waste office refused to grant an exemption, the individual was entitled to come before the Solid Waste Committee and request the exemption. The committee would then vote on whether an exemption should be granted.

8. Resolution No. 9570 provided little guidance to the committee as to when to grant exemptions. The committee recommended changes to Resolution No. 9570 which were ultimately incorporated into Resolution No. 9724.

9. Only Plaintiffs Maxie White (White), Charles Holt (Holt) and James Moss (Moss) appeared at trial and testified in this matter regarding their experience with the exemption process and/or the disposal fee assessed to them for their residence and/or business. No other named Plaintiff testified or otherwise produced any proof of the treatment they received with regard to their particular circumstances.

10. Holt, operator of a small business, filed for an exemption based upon the fact that he was not producing enough garbage to justify the fee. His request for an exemption was denied. White, an operator of an in-home woodwork business, applied for an exemption for the same reason and it was granted. Moss, an owner and landlord for some fifteen (15) rental dwellings, filed for an exemption because he believed the fee was unfair. He complains that he should not have to pay fees for every residential property he owns because he rents them out. His request for an exemption was denied. Moss alleged that the Keg County Cowboy Club was granted an exemption and he should be treated similarly. The Keg County Cowboy Club is a recreational campground and not a residential property.

11. For the initial billing in 1996 (the first time the fee was billed), White was assessed the $90 fee for her residence and $180 for her business. White testified that she paid the fee for her residence and went to the Committee and requested an exemption from payment for her in-home business because she did not generate any waste from her business. This exemption was granted. Thereafter this lawsuit was filed and she has not requested any further exemptions for her home or business and she has not paid any fee assessed to her for her home or business. In particular, White has not paid the assessed fees or requested any type of exemption since the enactment of Resolution 9724. Her basic contention is that the fees charged to her are excessive in proportion to the waste she generates.

12. White could not specifically identify any person or individual similarly situated to her who received treatment more favorable than she since the enactment of Resolution 9724.

13. For the initial billing in 1996, Holt was assessed a fee for his residence in the amount of $90 and $180 for his business. Holt requested that he be exempted because "I did not produce enough garbage for the fee." The requested exemption was denied. Holt admitted that his business generated waste, he simply thinks that the fee of $180 was excessive in proportion to the waste he personally generated. Holt testified that he believes that the residential fee is also excessive based upon the amount of trash generated by him and he believes that the County should, instead, implement a tipping fee so that citizens would only pay for what they generate/use. Like White, Holt has not paid any fee assessed to his residence or business since the filing of this lawsuit. Nor has he applied for any exemption since 1996.

14. Moss has never paid any fee assessed to him since its implementation and has never applied to the Committee for an exemption.

Assertions that the solid waste disposal fees are improper because they are not keyed to a proportional use of the solid waste facilities provide no basis for relief. It has been held that a county can legally impose a monthly fee on all of its residents for solid waste disposal services regardless of whether or not the services are actually utilized. *Horton v. Carroll County*, 968 S.W.2d 841 (Tenn.Ct.App. 1997).

As to the issue of the alleged arbitrary and capricious nature of the exemption process, the trial court held:

> The last issue for this Court to determine is whether the exemption process utilized by the County is arbitrary and capricious. The County is authorized by statute it (sic) impose the solid waste disposal fee on all residence (sic). The manner by which this fee was being imposed bears a reasonable relation to a proper legislative purpose. <u>Newton v. Cox</u>, 878 S.W.2d 105 (Tenn. 1994). Further, the statutory procedure, as it was imposed, was neither arbitrary nor discriminatory and comports with substantive due process. This Court finds that there is no evidence of any discriminatory purpose for the classification system and that the exemptions have not been granted in an arbitrary manner.
>
> Plaintiffs presented two lists summarizing exemptions granted by the County. (Trial Exhibits 15 & 16). Both lists appear to contain inconsistencies regarding the granting of exemptions. Dwight Sullivan, former chairman of the Solid Waste Committee, testified regarding the supposed inconsistencies. Mr. Sullivan explained that even though two people on the list claimed the same exemption (disability, fixed income, etc.), the exemption was only granted to those who actually established that they met the criteria. One way to establish this was to demonstrate to the committee that they qualified for the property tax reduction. These lists do not adequately provide the Court with evidence to conclude that the conduct of the County was arbitrary and capricious.
>
> White and Holt provided the only conclusive evidence of inconsistent treatment. White requested and was granted an exemption in 1996 for her in-home business. She was assessed a fee for her home ($90) and her in-home business ($180). The Solid Waste Committee found that her in-home business was not generating enough waste to justify the $180 fee in addition to the $90 she was already paying for the same building. She has not applied for another exemption since 1996. Holt requested and was denied exemptions in 1996. He was also assessed a fee for his home ($90) and his in-home business ($180). He has not applied for another exemption since 1996. In response to similar situations, the County Commission passed Resolution 9724 that amended the amount residents would have to pay for their residences and in-home businesses to $135 total. Both have been assessed the same fee since Resolution 9724 came into effect in 1997. This isolated incident is

not enough to convince the Court that the entire system of exemptions has been implemented in an arbitrary and capricious manner.

Plaintiffs simply offered no proof to support their assertions that the actions of County officials, in either granting or withholding exemptions, has been arbitrary or capricious.

Plaintiffs predicate almost their entire case on an assertion that, on a revenue versus expenditure cash analysis, solid waste fee collections have been excessive. They offer no proof that such a method of accounting is either mandated by law or proper when dealing with a statutorily mandated enterprise fund. The undisputed expert testimony is that an accrual method of accounting is mandated when dealing with an enterprise fund. It is further clear that the two capital outlay notes totaling $1,600,000 are mandated by statute to be general obligations of the County and that repayment of the same may be made from any funds available to the County. The only statutory mandate as to the use of the fees generated by the solid waste disposal program is that they must be used for solid waste disposal purposes. When the accrual method of accounting is used and both the proceeds of the capital outlay notes and the scheduled payback with interest of the notes is properly attributed to the enterprise fund, that fund is operating at a deficit. No proof is offered by Plaintiffs that would support a finding that the exemptions authorized by the statute are either unauthorized or applied in an arbitrary and capricious manner.

The judgment of the trial court is in all respects affirmed, and costs of the appeal are assessed to Appellants.

 

_____

WILLIAM B. CAIN, JUDGE